# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DONNA JEAN MAYFIELD,<br><br>        Plaintiff,<br><br>    v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>        Defendant. | Case No. 1:16-cv-01084-SAB<br><br>ORDER GRANTING IN PART PLAINTIFF'S SOCIAL SECURITY APPEAL AND REMANDING FOR FURTHER DEVELOPMENT OF THE RECORD<br><br>(ECF Nos. 14, 17) |

## I.

## INTRODUCTION

Plaintiff Donna Jean Mayfield ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for disability benefits pursuant to the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to Magistrate Judge Stanley A. Boone.[1]

Plaintiff suffers from degenerative lumbar disc disease and chronic pain syndrome. For the reasons set forth below, Plaintiff's Social Security appeal shall be granted in part and remanded for further development of the record.

---
[1] The parties have consented to the jurisdiction of the United States Magistrate Judge. (See ECF Nos. 7, 8.)

1

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff protectively filed a Title II application for a period of disability and disability insurance benefits on July 23, 2012, alleging disability beginning September 2, 2011. (AR 191-93.) Plaintiff's application was initially denied on February 25, 2013, and denied upon reconsideration on July 22, 2013. (AR 88-115.) Plaintiff requested and received a hearing before Administrative Law Judge Susanne Lewald ("the ALJ"). Plaintiff appeared for a hearing via video teleconference on November 12, 2014. (AR 46-86.) On March 28, 2014, the ALJ found that Plaintiff was not disabled. (AR 17-33.) The Appeals Council denied Plaintiff's request for review on May 27, 2016. (AR 1-6.)

### A. Relevant Hearing Testimony

A medical expert, Dr. Richard Hudson,[2] testified at the hearing. Based on a review of the medical record, Dr. Hudson noted that Plaintiff had an MRI of the lumbar spine indicating L5-S1 disc herniation; a surgical procedure involving a left L5-S1 disc herniation with removal of the disc and a decompression of the nerve roots on October 4, 2010; a discogram on February 3, 2012, that was positive or concordant for the type of pain that Plaintiff had at L4-4 and L5-S1, but L2-3 and L3-4 were negative; an MRI on January 21, 2011, which showed a repeat L1-2 small protrusion, L4-5 diffuse bulge and mild facet degenerative joint disease, and a bilateral bulging obtrusion; a two level spinal fusion with cages, internal fixation, and bone graft at L4-5 and L5-S1 by Dr. Todd Peters on May 21, 2013; an August 30, 2012 MRI showing small spurs at C5-6 and some facet changes, a bulging of the disc at C4-5, and a bulge at C6 with mild facet changes; a July 24, 2013 MRI where the lordosis or curl was normal, mild levo or left sided curvature or scoliosis in the lumbar spine, no compression fractures, and posterior lumbar interbody fusion from L4 to the sacrum; and a CAT scan of the lumbar spine on December 17, 2013, which did not find or report a pseudoarthrosis. (AR 51-55.) Dr. Hudson also noted that Dr. Leung's December 16, 2013 opinion indicated that there was a question whether there was

---

[2] The ALJ referred to him as Dr. Hutson.

pseudoarthrosis, where the fusion might not be healed, and that Dr. Perdikis mentioned that the graft was not fusing. (AR 54.)

Considering the listings, Dr. Hudson found that Plaintiff has vertebrogenic disorders in the lumbar spine, having had two surgeries in the lumbar spine. (AR 52.) Dr. Hudson found that Plaintiff does not equal or meet listing 1.04 in severity. (AR 52.) Dr. Hudson found that Plaintiff could do sedentary work; lift 10 pounds occasionally and less than 10 pounds frequently; stand or walk 2 hours in an 8 hour day; sit 6 hours in an 8 hour day with a sit-stand option where she can stand up 5 minutes of every hour and not leave the work station, though the 5 minutes would not have to be consecutive; postural items on an occasional basis, except no ladders or scaffolds; no overhead reaching with the upper extremities; and for environmental limitations she would need to avoid concentrated exposure of extreme cold, extreme heat, wetness, humidity, and vibration, and no heights, hazardous areas, or moving machinery. (AR 52-53, 56.)

Dr. Hudson looked at page 8 of Exhibit 21F, which is the report of the December 17, 2013 lumbar CT and he stated that the graft has partially taken to the bone, but not completely yet. (AR 56.) Dr. Hudson indicated that sometimes it takes 2 years for a bone graft to be incorporated in a spinal fusion. (AR 57.) The bone graft is there and the metal is holding the bones together to allow the bone to get a new blood supply and then heal. (AR 57.) Incomplete bony bridging means that it has not yet completely fused. (AR 57.) Plaintiff's surgeon does not mention that she had a pseudoarthrosis at that level. (AR 57.) The only one who mentioned that there was a pseudoarthrosis at that level was Dr. Leung, a neurosurgeon who is a pain doctor. (AR 57.) Dr. Hudson stated that there is no way to correlate the results of a CT scan or an MRI to how much pain a person has or how much someone can function. (AR 57-58.) Dr. Hudson was surprised that there had not been another CT scan done, but Plaintiff stated that it has been an insurance issue. (AR 58.)

Plaintiff also testified at the hearing by video teleconference. Plaintiff is 45 years old and her birthday is May 29, 1969. (AR 59.) She is not married and has no children. (AR 60.) She lives with her mother and uncle. (AR 60.) She has an AA degree in humanities and a certificate

in a medical program where she learned coding and medical terminology. (AR 59-60.)

She has a driver's license and is able to drive on a limited basis. (AR 60.) The farthest she drives is 10 or 12 miles. (AR 60.) Plaintiff's aunt drives her to the doctor, who is an hour away, and a friend drove her to the hearing. (AR 60-61.)

She last worked at Riverside County Regional Medical Center in 2011 before she went on temporary disability in September 2011 and resigned in 2012. (AR 61, 64.) She did not attempt to go back to work after her fusion surgery in 2012. (AR 61-62.) She had gone back to work for 10 months after her first surgery. (AR 61.) She had worked there for 13 years as a medical records clerk where she had to walk, stand, and sit. (AR 62.) She did customer service at a public window, did computer input, worked the phones, pulled charts, filed, made copies at the copy machine, lifted boxes and reams of paper, and transported charts. (AR 62-64.) She did not supervise any employees. (AR 64.) Before working at Riverside County Regional Medical Center, she worked at a sports clinic for 2 years. (AR 64.)

She has intense pain where she cannot sit for over 10 to 15 minutes. (AR 65.) At most, she could sit 20 minutes, but the pain really hurts and is intense by the time 20 minutes has passed. (AR 73.) She cannot walk a lot because the pain radiates down both of her legs and shoots down her thighs, knees, and sides of her calves into her feet. (AR 65.) She cannot do paperwork where she has to put her head down even for a few seconds. (AR 65.) She has spasms 24/7 in her back and up her spine into her neck. (AR 65.) When she tries to do anything in a prolonged position, the pain is unbearable in her lumbar spine and it spasms up to the middle of her spine and neck. (AR 65.) She cannot concentrate on anything because she is always in pain. (AR 78.)

She is not sure how long she can sit throughout the day. (AR 73.) She stands for a few hours throughout the day, but not for a long time continuously. (AR 74.) She walks her dog in the afternoon for about 15 or 20 minutes, but then she has to lay down or lean back on the couch. (AR 74.) She lays down for 2 or 3 hours a day and she sleeps and take naps. (AR 75.) She has 6 bad days a week where she lays down most of the time. (AR 76.)

Dr. Langston Holly performed the first surgery, which was a discectomy on one of her

three herniated bulging discs. (AR 78.) She had two sets of cortisone injections, but they did not work. (AR 78.) Her sciatica and the radiculopathy improved for 3 or 4 months, but it intensified after the surgery in October 2010, so she had the spinal fusion. (AR 78.) She has had spinal decompression, acupuncture, massages, and physical therapy, so there is nothing further to do. (AR 78.) She could have a revision of the spinal fusion, but Dr. Perdikis said it would be a very poor prognosis and she could end up in worse pain or in a wheelchair. (AR 79.) Dr. Perdikis said what is going to make it fuse the next time since it has not fused this time. (AR 79.)

She has talked about her pain with Dr. Perdikis, but the pain medication is not controlling it. (AR 65-66.) Dr. Perdikis has tried prescribing different medications for her, but she is sensitive to the medications. (AR 66.) She started taking OxyContin when she had the fusion in 2012, but the pain is so intense that she cannot stop taking it. (AR 66.) The Vicodin is not enough to control the pain. (AR 66.) Dr. Perdikis prescribed Methadone to help the pain, but it made her nauseated, dizzy, and sick, so she went back to the OxyContin. (AR 67.)

The OxyContin causes her severe stomach pain and cramps, and it intensifies her IBS symptoms. (AR 68.) So she also takes Linzess, which causes really bad constipation. (AR 68.) She does not usually have diarrhea, but she has constipation. (AR 68.) The Vicodin is causing dizziness and causing her hairline to recede. (AR 68.) She takes Ambien because she has a hard time sleeping, but it makes her groggy and nauseous. (AR 68-69.) The Baclofen, a muscle relaxer, helps a little, but she still has spasms, and she has dizziness, nausea, and her depth perception and reflexes are affected. (AR 69.)

Since she is a thin and petite person, she feels the hardware in her back and she always feels a heaviness and radiating, penetrating pain from the metal in her back. (AR 66.)

She went to a program called VMC because she thought it was going to teach her ways to help control her pain without the opiates because she wanted a healthier alternative method, but it was a rehab for addicts. (AR 67.) She was there for 6 days without her medications and she was in excruciating pain where she could barely walk, so she left the program. (AR 67.)

She is independent with showering, bathing, doing her hair, and getting dressed, but she sometimes needs help with her shoes and she does use a grabber to pick things up. (AR 69-70.)

Her mom does all of the cooking and the shopping and helps her because she uses a walker in the morning, which was prescribed when she had the fusion surgery. (AR 70.) Plaintiff does a minimal amount of chores around the house. (AR 70.) When she does the dishes, she can only stand there for less than 10 minutes. (AR 70.) She lays down in her bed or leans back on the couch with pillows behind her a lot of times during the day because of the pain in her neck and lumbar spine. (AR 71.) She watches TV and reads during the day. (AR 72.) When she reads, she cannot look down at the book, so she has to hold the book level. (AR 72.)

She goes shopping with her mom to Rite Aid or K-Mart on rare occasions, but she does not go grocery shopping. (AR 71.) On the rare occasions when she goes out, she cannot go out for longer than 2 or 3 hours. (AR 72.) She goes to church services that are 1 ½ to 2 hours long, but she has to stand up and move around every 10 to 20 minutes. (AR 72.)

She has a dog that is 9 to 10 pounds and she can pick him up if she has to for 5 to 10 minutes, but she normally does not. (AR 81.) She picked him up one time during a walk when a huge Labrador ran up, but she torqued her back and she was in pain for 3 days. (AR 81.)

She used to like to hike and last went on a hike before her first surgery, the discectomy. (AR 72-73.) She was very active and athletic before her injury. (AR 73.)

Dr. Perdikis, who is the only doctor she is seeing, is not talking about doing any intervention on her cervical spine. (AR 76-77.) The doctor she saw in Riverside who did the fusion surgery ordered the CT that she had on December 17, 2013, but then he left the practice. (AR 76.) After Plaintiff resigned from her job, she had to move to Bishop and her COBRA insurance did not cover any doctors in Bishop, so she could not get an orthopedic doctor to continue her treatment. (AR 77.) She goes to Dr. Perdikis for pain management and pays cash to see him. (AR 77.) Her insurance covers her medications. (AR 77.)

During the hearing, she leaned on the table when she stood up because it gave her support and the medications make her dizzy and lightheaded. (AR 79.) She carried in her hand a bag with a little folder in it and her purse. (AR 80.)

A vocational expert also testified at the hearing. (AR 82-86.)

/ / /

**B.     ALJ Findings**

The ALJ made the following findings of fact and conclusions of law.

- Plaintiff meets the insured status requirements of the Social Security Act through March 31, 2017.
- Plaintiff has not engaged in substantial gainful activity since September 2, 2011, the alleged onset date.
- Plaintiff has the following severe impairments: degenerative lumbar disc disease and chronic pain syndrome.
- Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments.
- Plaintiff has the residual functional capacity to perform a range of sedentary work as defined in 20 CFR 404.1567(a), that is, she can lift 5 pounds frequently and 10 pounds occasionally; stand/walk for a 2 hours out of an 8-hour workday; sit for a total of 6 hours out of an 8-hour workday with a sit/stand option; limited bending and stooping to 1-2 times an hour; occasional balancing, kneeling, crouching, crawling, and climbing ramps and stairs; occasional overhead reaching with the bilateral upper extremities; and a preclusion from working from heights, climbing ladders, ropers and scaffolds, working around hazardous equipment or in hot/cold temperature extremes and sustained vibration.
- Plaintiff is unable to perform any past relevant work.
- Plaintiff was born on May 29, 1969, and was 42 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date. Plaintiff subsequently changed age categories to a younger individual age 45-49.
- Plaintiff has at least a high school education and is able to communicate in English.
- Plaintiff has acquired work skills from past relevant work.
- Considering Plaintiff's age, education, work experience, and RFC, Plaintiff has acquired work skills from past relevant work that are transferable to other occupations with jobs existing in significant numbers in the national economy.

1 - Plaintiff has not been under a disability, as defined in the Social Security Act, from September 2, 2011, through the date of this decision.

(AR 20-33.)

## III.

## LEGAL STANDARD

To qualify for disability insurance benefits under the Social Security Act, the claimant must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security Regulations set out a five step sequential evaluation process to be used in determining if a claimant is disabled. 20 C.F.R. § 404.1520; Batson v. Commissioner of Social Security Administration, 359 F.3d 1190, 1194 (9th Cir. 2004). The five steps in the sequential evaluation in assessing whether the claimant is disabled are:

> Step one: Is the claimant presently engaged in substantial gainful activity? If so, the claimant is not disabled. If not, proceed to step two.
>
> Step two: Is the claimant's alleged impairment sufficiently severe to limit his or her ability to work? If so, proceed to step three. If not, the claimant is not disabled.
>
> Step three: Does the claimant's impairment, or combination of impairments, meet or equal an impairment listed in 20 C.F.R., pt. 404, subpt. P, app. 1? If so, the claimant is disabled. If not, proceed to step four.
>
> Step four: Does the claimant possess the residual functional capacity ("RFC") to perform his or her past relevant work? If so, the claimant is not disabled. If not, proceed to step five.
>
> Step five: Does the claimant's RFC, when considered with the claimant's age, education, and work experience, allow him or her to adjust to other work that exists in significant numbers in the national economy? If so, the claimant is not disabled. If not, the claimant is disabled.

Stout v. Commissioner, Social Sec. Admin., 454 F.3d 1050, 1052 (9th Cir. 2006).

Congress has provided that an individual may obtain judicial review of any final decision of the Commissioner of Social Security regarding entitlement to benefits. 42 U.S.C. § 405(g). In reviewing findings of fact in respect to the denial of benefits, this court "reviews the

Commissioner's final decision for substantial evidence, and the Commissioner's decision will be disturbed only if it is not supported by substantial evidence or is based on legal error." Hill v. Astrue, 698 F.3d 1153, 1158 (9th Cir. 2012). "Substantial evidence" means more than a scintilla, but less than a preponderance. Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (internal quotations and citations omitted). "Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion." Thomas v. Barnhart, 278 F.3d 947, 955 (9th Cir. 2002) (quoting Flaten v. Sec'y of Health & Human Servs., 44 F.3d 1453, 1457 (9th Cir. 1995)).

"[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." Hill, 698 F.3d at 1159 (quoting Robbins v. Social Security Administration, 466 F.3d 880, 882 (9th Cir. 2006). However, it is not this Court's function to second guess the ALJ's conclusions and substitute the court's judgment for the ALJ's. See Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld.").

## IV.

## DISCUSSION AND ANALYSIS

### A. Plaintiff's Credibility

Plaintiff argues that the ALJ erred in rejecting her testimony. Plaintiff contends that her inability to sit for prolonged periods, need for a sit/stand option, need to rest, and bending limitation cause her to be unable to engage in any substantial gainful activity. Defendant counters that the ALJ correctly evaluated Plaintiff's subjective complaints of pain and provided specific and valid reasons to determine that her complaints were not credible.

"An ALJ is not required to believe every allegation of disabling pain or other non-exertional impairment." Orn v. Astrue, 495 F.3d 625, 635 (9th Cir. 2007) (internal punctuation and citations omitted). Determining whether a claimant's testimony regarding subjective pain or symptoms is credible, requires the ALJ to engage in a two-step analysis. Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012). The ALJ must first determine if "the claimant has presented

9

objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007) (internal punctuation and citations omitted). This does not require the claimant to show that her impairment could be expected to cause the severity of the symptoms that are alleged, but only that it reasonably could have caused some degree of symptoms. Smolen, 80 F.3d at 1282.

Second, if the first test is met and there is no evidence of malingering, the ALJ can only reject the claimant's testimony regarding the severity of her symptoms by offering "clear and convincing reasons" for the adverse credibility finding. Carmickle v. Commissioner of Social Security, 533 F.3d 1155, 1160 (9th Cir. 2008). The ALJ must specifically make findings that support this conclusion and the findings must be sufficiently specific to allow a reviewing court to conclude the ALJ rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit the claimant's testimony. Moisa v. Barnhart, 367 F.3d 882, 885 (9th Cir. 2004) (internal punctuation and citations omitted).

Factors that may be considered in assessing a claimant's subjective pain and symptom testimony include the claimant's daily activities; the location, duration, intensity and frequency of the pain or symptoms; factors that cause or aggravate the symptoms; the type, dosage, effectiveness or side effects of any medication; other measures or treatment used for relief; functional restrictions; and other relevant factors. Lingenfelter, at 1040; Thomas, 278 F.3d at 958. In assessing the claimant's credibility, the ALJ may also consider "(1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; [and] (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment. . . ." Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008) (quoting Smolen, 80 F.3d at 1284).

In this instance, the ALJ stated that "[she] cannot find greater functional limitations or

total disability based on the subjective complaints because they are not fully credible."[3] (AR 31.) In the physical analysis section of the opinion, the ALJ stated that "[she] also [has] taken into consideration [Plaintiff's] pain complaints insofar as they are supportable by the documentary evidence to find that [Plaintiff] retains the residual functional capacity for sedentary work…" (AR 26.)

The ALJ cited several reasons to discredit Plaintiff's testimony. Therefore, the Court shall address the reasons stated by the ALJ to determine if the ALJ provided clear and convincing reasons to find Plaintiff's testimony not credible.

1. <u>Daily Activities</u>

The ALJ found that "[Plaintiff's] activities of daily living are not consistent with the extreme physical and mental incapacitation she alleges." (AR 32.) The ALJ elaborated by finding that Plaintiff "stated that she has adequate self-care skills of dressing, bathing, eating, toileting and safety precautions. She does household chores and runs errands. Her hobbies include reading, writing and playing with the dog. She can manage her own funds. She is able to drive herself place [sic] by herself. She has a close and good relationship with her family."[4] (AR 32.) The ALJ stated that Plaintiff reported in May 2013 that she cannot sit or stand more than 10-15 minutes at a time, that she has to lie down at intervals throughout the day, she is in a constant state of exhaustion and weakness since she cannot sleep due to the pain, and that she suffers side effects from her medication. (AR 21, 243-46.) The ALJ noted that in September 2013 Plaintiff stated that it is difficult for her to get around even with a walker and that she cannot stand more than 1.5 hours and sit 20 minutes at a time. (AR 21, 255.) In summarizing Plaintiff's hearing testimony, the ALJ noted that Plaintiff cannot work because she has pain sitting more than 20 minutes, she cannot walk because her pain goes down both of her legs, she cannot put her head down to look at papers or read, she cannot do anything that takes over an

---

[3] While the ALJ gave reasons for rejecting Plaintiff's mental health limitations, the ALJ separately analyzed the mental and physical evidence in the record. In the ALJ's physical analysis section, she provided several reasons for rejecting Plaintiff's credibility and setting forth the RFC. Therefore, the Court does not consider Plaintiff's lack of mental health treatment in considering whether the ALJ properly evaluated Plaintiff's complaints of pain.

[4] The Court notes that the activities of daily living that the ALJ cites are the ones that Dr. Thaworn Rathana-Nakintara noted in the March 16, 2013 psychiatric consultative evaluation. (AR 28, 32, 759-60.)

11

hour, she cannot stand for more than a few hours total in a day, she lies down for 2 to 3 hours in a day, and she has 6 bad days out of 7.  (AR 21-22, 65, 72-76.)

There are two ways for an ALJ to "use daily activities to form the basis of an adverse credibility determination: if the claimant's activity contradicts his testimony or if the claimant's activity meets the threshold for transferable work skills." Phillips v. Colvin, 61 F. Supp. 3d 925, 944 (N.D. Cal. 2014).  The Ninth Circuit "has repeatedly asserted that the mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability." Vertigan v. Halter, 260 F.3d 1044, 1050 (9th Cir. 2001).

The fact that Plaintiff is able to take care of dressing, bathing, eating, toileting, and safety precautions by herself does not contradict the physical and mental incapacitation she alleges. Further, Plaintiff testified at the hearing that she sometimes needs help with her shoes and she uses a grabber to pick things up.  (AR 69-70.)

The ALJ stated that Plaintiff does household chores and runs errands, but Plaintiff testified at the hearing that she does a minimal amount of chores around the house and that when she does the dishes, she can only stand there for less than 10 minutes.  (AR 70.)  She also testified that her mom does all of the cooking and the shopping and helps her.  (AR 32, 70.)  She testified that rarely goes shopping with her mom to Rite aid or K-Mart, but she does not go grocery shopping.  (AR 71.)  On the rare occasions when she goes out, she cannot go out for longer than 2 or 3 hours.  (AR 72.)  Plaintiff told Dr. Rathana-Nakintara during the March 2013 consultative psychiatric examination that she does not shop or cook.  (AR 28, 760.)  On May 16, 2013, Plaintiff reported that she needs help with meals being prepared for her, shopping, household chores (she is unable to vacuum), help with items that need to lifted (cannot lift anything heavy), and help with any kind of physical labor (like washing the car).  (AR 243.)

The ALJ also stated that Plaintiff has hobbies, including reading, writing, and playing with the dog.  (AR 32.)  While Plaintiff testified that she watches TV and reads during the day, she also testified that she lays down in her bed or leans back on the couch with pillows behind her a lot of times during the day because of the pain in her neck and lumbar spine.  (AR 71-72.)

She also testified that when she reads, she cannot look down at the book, so she has to hold the book level. (AR 72.) During the hearing, Plaintiff testified that she walks her 9 to 10 pound dog in the afternoon for about 15 or 20 minutes, but then she has to lay down or lean back on the couch. (AR 74, 81.) She testified that she needs the dog to jump on the couch so that she can put on the harness. (AR 70.)

While Plaintiff is able to drive, she stated she is able to drive only on a limited basis and the farthest she drives is 10 or 12 miles. (AR 60.) The ALJ found that Plaintiff has a close and good relationship with her family, but the ALJ did not point out that Plaintiff alleged otherwise or any limitations that would be inconsistent with that.

Therefore, the Court finds that there is not substantial evidence in the record to support the ALJ's finding that Plaintiff's activities of daily living are not consistent with the limitations she alleges.

2. <u>Conservative Treatment and Failure to Seek Treatment</u>

The ALJ found that Plaintiff's subjective complaints and alleged limitations are not consistent with the treatment she receives. (AR 32.) The ALJ found that:

> [Plaintiff] has routine medication follow up and pain management, but no direct mental health treatment. Despite her complaints of incapacitating pain, [Plaintiff] has not required repeated inpatient or emergency room treatment due to symptoms and/or functional limitations that persist despite treatment compliance. [Plaintiff] has not required aggressive physical therapy, additional surgeries, participation in an aggressive pain management program or placement in a sheltered day treatment program due to the fragility of her condition and inability to function without constant guidance and assistance.

(AR 32.)

The record shows that Plaintiff had back surgery in the form of a left L5-S1 hemilaminotomy, medial facetectomy, and microdiskectomy on October 4, 2010. (AR 276.) On May 21, 2012, Plaintiff underwent minimally invasive TLIF fusion at L4/L5 and L5/S1. (AR 501-02.) After Plaintiff's May 2012 surgery, she took Vicodin and OxyContin and also did physical therapy for a time until she was discharged due to non-attendance, though she did tell them that she was moving. (AR 609-11, 797-800, 806-09, 900, 932.)

While the ALJ suggests that Plaintiff has only required conservative care for her

condition, there is not substantial evidence to support this. While an "unexplained, or inadequately explained, failure to seek treatment" may be the basis for an adverse credibility finding, Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989), to the extent that the ALJ discredits Plaintiff for a failure to seek treatment, there is not substantial evidence to support this finding.

### 3. Improvement with Medication

In the physical analysis section, the ALJ noted that the record does not corroborate the extent of Plaintiff's subjective complaints and that although she complains of severe back pain and sees a pain manager, Dr. Perdikis admitted stability on his medication regimen. (AR 27.) The ALJ pointed out that Dr. Perdikis reported that the pain is controlled with medication and that she was stable and doing well on her current regime. (AR 797, 888, 891.)

"Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for" social security benefits. Warre v. Comm'r Soc. Sec. Admin., 439 F.3d 1001, 1006 (9th Cir. 2006).

On January 15, 2014, Dr. Leung noted that Plaintiff said that the medication reduces her pain to a tolerable level allowing her to maintain her functioning.[5] (AR 797.) On that day, Plaintiff also reported continuing low back and bilateral leg pain. (AR 797.)

On May 15, 2014, Dr. Perdikis noted that Plaintiff is stable and she is doing well with the pain management plan. (AR 891.) On June 19, 2014, Dr. Perdikis noted that Plaintiff is stable. (AR 888.) However, on May 15, 2014, and June 19, 2014, noted that Plaintiff states 40% overall pain control with current medications. (AR 888, 891.)

It is unclear what Dr. Perdikis meant by stable. While Defendant appears to assert that stable means that Plaintiff's condition has improved, it is unclear from the record if that is what Dr. Perdikis meant. Plaintiff was still complaining of pain at the time of Dr. Perdikis's May 15, 2014 and June 19, 2014 reports and she stated that her medication was only improving her pain about 40%. It is also unclear what Plaintiff meant when she told Dr. Leung that the medication reduced the pain to a tolerable level allowing her to maintain functioning. Although there is

---

[5] The ALJ had identified this record as one that Dr. Perdikis wrote.

14

some evidence that Plaintiff received partial relief from pain medications, this evidence must be taken in the context of her overall health, which the record shows was characterized by severe pain. Therefore, this is not a clear and convincing reason supported by substantial evidence for discrediting Plaintiff's testimony. The fact that there are notations in Dr. Perdikis's treatment notes that Plaintiff was stable at times and doing well on the pain management medications and that Plaintiff told Dr. Leung that the medication reduces her pain to a tolerable level allowing her to maintain her functioning creates a question that further development of the record may be able to resolve.

4. <u>Inconsistency With Medical Record</u>

The ALJ found that Plaintiff's "subjective complaints and alleged limitations are out of proportion to the objective clinical findings and observed functional restrictions as noted above." (AR 31.) The ALJ then detailed specific inconsistencies with the medical record, including whether Plaintiff has a medical necessity for an ambulatory assistive device or other type of devices,[6] medical necessity to elevate body parts during working hours, medical necessity to lie down and/or sleep during working hours, and adverse side effects that she alleges.[7] (AR 21, 31-32.) The ALJ had also noted that she took into consideration Plaintiff's pain complaints insofar as they are supportable by the documentary evidence in finding that Plaintiff could perform the RFC.[8] (AR 26.)

---

[6] To the extent that Plaintiff argues that her need for a walker demonstrates that she meets or equals a listing, her argument fails. Plaintiff states that her need for a walker corresponds with an inability to ambulate effectively, and that contends that that "generally meets the severity portion of the listings" such as 1.04C, 14.05A, and 14.09A1. Plaintiff does not mention or address how she meets the other criteria of the listings that she cites. The fact that Plaintiff may meet one element when there are other required elements is not sufficient to meet the listing.

[7] Defendant argues that the ALJ also considered that the medical opinions of the testifying medical expert that the medical expert, psychiatric consultative examiner, and State agency physicians contradicted Plaintiff's claims of disability. While it is arguable whether the ALJ discredited Plaintiff on this basis, this reason would coincide with the ALJ's reason that Plaintiff's testimony is not supported by the objective medical evidence since the opinions are based on the objective evidence. Therefore, this is not a separate and distinct reason, and the ALJ cannot discredit Plaintiff's pain testimony solely because it is found not to be supported by the objective medical evidence. Rollins, 261 F.3d at 857.

[8] The Court notes that the ALJ stated two times that "[i]n December 2013, Dr. Leung noted that objective studies ruled out pseudoarthrosis." (AR 24, 27.) Dr. Leung saw Plaintiff on December 16, 2013, and then Plaintiff had a CT scan on December 17, 2013. On December 16, 2013, Dr. Leung stated in his report that "Dr. Peters reviewed her MRI and he recommended further evaluation of a CT scan to rule out pseudoarthrosis." (AR 806.) Dr. Leung did not rule out pseudoarthrosis in that report, which was his only December 2013 report. (AR 806-809.) Dr.

15

The determination that a claimant's complaints are inconsistent with clinical evaluations can satisfy the requirement of stating a clear and convincing reason for discrediting the claimant's testimony. Regennitter v. Commissioner of Social Sec. Admin., 166 F.3d 1294, 1297 9th Cir. 1999). However, the ALJ cannot discredit Plaintiff's pain testimony solely because it is found not to be supported by the objective medical evidence. Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001) (citing 20 C.F.R. § 404.1529(c)(2)); Bunnell v. Sullivan, 947 F.2d 341, 347 (9th Cir. 1991). As discussed above, the Court finds that the other reasons that the ALJ gave for discrediting Plaintiff's testimony besides the inconsistencies with clinical evaluations and objective medical evidence are not clear and convincing reasons supported by substantial evidence. As the Court stated, further development is needed as to whether Plaintiff improved with medication. Therefore, even if there is substantial evidence to support the ALJ's finding that the clinical evaluations and objective evidence are inconsistent with Plaintiff's complaints, the ALJ could not properly reject Plaintiff's testimony on this reason alone.[9] See Bunnell, 947 F.2d at 347. If on remand, in addition to inconsistencies with objective evidence and clinical evaluations, the ALJ provides other clear and convincing reasons supported by substantial evidence for rejecting Plaintiff's testimony, such as that Plaintiff improved with medication, then the inconsistencies with objective evidence and clinical evaluations may be a proper reason for rejecting Plaintiff's credibility.

5. The ALJ Did Not Provide Clear and Convincing Reasons for the Adverse Credibility Determination

Based on the foregoing, the Court finds that the ALJ did not provide clear and convincing reasons, supported by substantial evidence in the record, to find that Plaintiff's symptom

---

Hudson, the medical expert who testified at the hearing, testified, "[s]o I guess the [CT] scan answered [Dr. Leung's] question, that a pseudoarthrosis was not found or reported on that study." (AR 54-55.) Dr. Leung's January 2014 report did not rule out pseudoarthosis either. (AR 797-800.)

[9] Defendant also argues that the ALJ properly considered that Plaintiff continued to work for a time after her alleged disability onset date. The ALJ did note that Plaintiff had worked after the alleged onset date, but did not clearly discredit Plaintiff on this basis. (AR 21.) While the Court may draw reasonable inferences from the ALJ's opinion, Magallanes v. Bowen, 881 F.2d 747, 775 (9th Cir. 1989), it cannot consider Defendant's post hac rationalizations. "A reviewing court can evaluate an agency's decision only on the grounds articulated by the agency." Ceguerra v. Sec'y of Health & Human Servs., 933 F.2d 735, 738 (9th Cir. 1991).

testimony was not credible.

**B.	Remand**

The ordinary remand rule provides that when "the record before the agency does not support the agency action, ... the agency has not considered all relevant factors, or ... the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." Treichler v. Comm'r of Soc. Sec. Admin., 775 F.3d 1090, 1099 (9th Cir. 2014). This applies equally in Social Security cases. Treichler, 775 F.3d at 1099. Under the Social Security Act "courts are empowered to affirm, modify, or reverse a decision by the Commissioner '*with or without* remanding the cause for a rehearing.' " Garrison v. Colvin, 759 F.3d 995, 1019 (9th Cir. 2014) (emphasis in original) (quoting 42 U.S.C. § 405(g)). The decision to remand for benefits is discretionary. Treichler, 775 F.3d at 1100. In Social Security cases, courts generally remand with instructions to calculate and award benefits when it is clear from the record that the claimant is entitled to benefits. Garrison, 759 F.3d at 1019.

The Ninth Circuit has "devised a three-part credit-as-true standard, each part of which must be satisfied in order for a court to remand to an ALJ with instructions to calculate and award benefits: (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand." Garrison, 759 F.3d at 1020. The credit as true doctrine allows "flexibility" which "is properly understood as requiring courts to remand for further proceedings when, even though all conditions of the credit-as-true rule are satisfied, an evaluation of the record as a whole creates serious doubt that a claimant is, in fact, disabled. Id. at 1021. Even when the circumstances are present to remand for benefits, "[t]he decision whether to remand a case for additional evidence or simply to award benefits is in our discretion." Treichler. 775 F.3d at 1102 (quoting Swenson v. Sullivan, 876 F.2d 683, 689 (9th Cir. 1989)).

Here, the record casts doubt on whether Plaintiff is disabled. As the ALJ noted, there are objective findings in the record that do not support Plaintiff's claimed limitations. There were multiple medical opinions in the record that the ALJ relied on that contradicted Plaintiff's testimony. The ALJ gave determinative weight to Dr. Hudson's opinion and lesser weight to the Disability Determination Service medical consultants. (AR 26.) The ALJ gave no weight to the assessments of Dr. Perdikis and Dr. Peters. (AR 26-27.) Further, as previously discussed, there is a question as to what Dr. Perdikis meant by stable on medication and what Plaintiff meant when she told Dr. Leung that the medication reduced the pain to a tolerable level allowing her to maintain functioning.

Accordingly, this action shall be remanded for further consideration.

## V.

## ORDER

Accordingly, IT IS HEREBY ORDERED that:

1. Plaintiff's appeal from the decision of the Commissioner of Social Security is GRANTED IN PART AND DENIED IN PART;

2. The Court REMANDS this action back to the Commissioner for further administrative proceedings consistent with this opinion;

3. The Clerk of the Court is DIRECTED to enter judgment in favor of Plaintiff Donna Jean Mayfield and against Defendant Commissioner of Social Security; and

4. The Clerk of the Court is directed to CLOSE this action.

IT IS SO ORDERED.

Dated: **September 1, 2017**

UNITED STATES MAGISTRATE JUDGE